UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| DELTA AIR LINES, INC., | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 6:15-cv-<br>) 2079-ORL-<br>) 31 TBS |
| GONZOLINA SOTOLONGO;<br>DOUGLAS MARK FLETCHER;<br>JOSEPH CHIMENTI;<br>GERALD DECKER:<br>FULL MOON TRAVEL, INC. d/b/a<br>FIRST TRAVEL SERVICES d/b/a<br>TOURS R US SPECIAL VACATIONS<br>d/b/a BOOKITDISCOUNTCLUB.COM;<br>TWILIGHT TRAVEL, INC.;<br>DESTINEY MARKETING SERVICES,<br>INC.; and JOHN DOES 1-10, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**PLAINTIFF DELTA AIR LINES, INC.'S MOTION FOR
TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,
EX PARTE SEIZURE ORDER, AND EXPEDITED DISCOVERY AND
MEMORANDUM OF FACT AND LAW IN SUPPORT THEREOF**

Plaintiff Delta Air Lines, Inc. ("Delta" or "Plaintiff") files this Motion for Temporary Restraining Order, Preliminary Injunction, Ex Parte Seizure Order, and Expedited Discovery and Memorandum of Fact and Law in Support Thereof and shows as follows:

## FACTS

I. **DEFENDANTS' INFRINGEMENT: THE "H.R. FAX" SCHEME**
   A. **Overview of the "H.R. Fax Scam" Scheme**

This lawsuit presents a textbook case of intentional trademark infringement and counterfeiting by a well-organized group of intellectual property pirates. *(See generally, Exhibit A, Declaration of Alan E. Arnold ("Arnold Dec.") and discussion below).* The defendants

1

(collectively, "Defendants") have illegally and in bad faith misappropriated for profit Delta's protected name and marks, including, but not limited to, the venerable DELTA name and mark, Delta's iconic WIDGET LOGO mark, and the SKYTEAM mark (collectively, with Delta's other registered marks, the "Delta Marks"). *(Id.)* Specifically, Defendants have manufactured, transmitted, and are otherwise using and/or profiting from facsimile correspondence and other marketing materials that bear the Delta Marks and expressly and falsely purport to have been sent by Delta. *(See Sections I.B, below).* The purpose of Defendants' fraudulent impersonation of Delta is to further their enterprise of selling "travel packages" to the general public, implying that some sort of special discount exists by virtue of the Defendants' connection with the fax recipient's "H.R. Department" and/or Delta. *(Id.)*

The Defendants – both those identified in the Complaint as well as the as-yet-unidentified John Doe Defendants – have both <u>actual</u> and <u>constructive</u> knowledge of the infringing, fraudulent, and illegal nature of their own and the other Defendants' wrongful acts. *(Id.)* Defendants' illegal acts have caused and are continuing to cause irreparable harm to Delta. *(Id.)* On the basis of the facts and discussion set forth below, Delta respectfully requests that this Court grant the Proposed Order attached at Exhibit F.

The Defendants have gone to great lengths to conceal their identities. In the infringing faxes giving rise to Delta's claims, the Defendants:

- never display the telephone number(s) from which the faxes originate;
- have the only point-of-contact be a series of toll-free telephone numbers;
- never identify the name of the person(s), entity, or business selling the travel packages;
- process all purchases through a "travel agency" based in Mexico; and

- provide all travel documentation through a third-party document provider (Docusign).

All of these attempts at obfuscation seek to insulate the Defendants from liability by bolstering their expected claims that they were merely "innocent patsies" who were unaware of the illegal acts of the "real" wrongdoers.

**B. Specific Facts Supporting Delta's Claims and Requests for TRO, Seizure, and Expedited Discovery**

On or about November 25, 2014, Delta received a copy of a fax advertisement from a customer advertising "Cancun, Puerto Vallarta, Jamaica or Hawaii" purporting to have been sent from "H.R. / Delta Sky Team" (the "November Fax"). *Arnold Dec. at ¶¶ 21, 27 and Exhibit A-4 thereto.* The infringing November Fax states that it was sent by "H.R. / Delta Sky Team" and includes the WIDGET LOGO, DELTA, and SKYTEAM trademarks in the "letterhead" portion of the advertisement. *Id.* Further, the November Fax advertises that the "First 500 Receive Up to 60% off Flight." *Id.*

Delta's investigator, Tim Huhn ("Huhn"), called the toll-free number advertised on the November Fax and spoke to an individual who identified himself as "Mark Kelly" ("Kelly"). Huhn purchased a Hawaiian vacation package for $400. *See Exhibit B, Declaration of Tim Huhn ("Huhn Dec.") at ¶¶ 5-8.* When Huhn inquired about purchasing airfare, Kelly informed him that his company "has a contract with Delta and can get 60% off [of] published airfares to Hawaii." *Id. at ¶ 7.* Huhn subsequently received his receipt and other documents from Defendants via e-mail from the "Docusign" delivery service. *Id.* at ¶ 10-12 and Exhibits B-2 through B-4. Huhn's credit card payment was processed by "Salmon Industrias S.A. de C.V.", which is believed to be a travel agency located in Cancun, Mexico. *Id.* at ¶ 11 and Exhibit B-3.

Docusign identified the user of the account used to send the materials to Huhn as "Customer Service," with the website domain, "bookitdiscountclub.com," and a business address

3

in Orlando, Florida. *See Exhibit C, Declaration of Kelly O. Wallace ("Wallace Dec.") at ¶ 2 and Exhibit C-1 thereto.* Docusign identified approximately two dozen different e-mail addresses associated with that account, most of them associated with an Orlando, Florida telephone number belonging to Defendant Fletcher. *Id.* It also identified a number of other domain names, including (but not limited to) "firsttravelsvc.com." *Id.* The websites for "bookitdiscountclub.com," and "firsttravelsvc.com" are identical, with the exception that the latter indicates that it is "Owned and Operated by Full Moon Travel." *Id. at ¶¶ 5-6 and Exhibits C-4 and C-5 thereto.* In May, 2015, Huhn contacted the customer service number provided on the "bookitdiscountclub.com" web site and confirmed his previously-purchased Hawaiian vacation package reservation. *Huhn Dec. at ¶¶ 18-20 and Exhibit B-5 thereto.*

On or about August 27, 2015, Delta began receiving complaints from customers regarding a second wave of infringing fax advertisements (the "August Faxes") which appeared facially similar to the November Faxes, but displayed a different toll-free contact number. *Arnold Dec. at ¶¶ 26-27 and Exhibits A-4 and A-5 thereto.* Again, Huhn called the advertised number and purchased another vacation package. *Huhn Dec. at ¶¶ 23-26 and Exhibits B-6 through B-8 thereto.* Again, Huhn's credit card was charged by the same "travel agency" in Mexico, and he received a receipt and other documents from exactly the same Docusign account that Defendants used for the first transaction. *Id.*

C. **Identities of the Defendants and their Relation to the Infringing Fax Scheme**

Defendants, including those named in the *Complaint* and the as-yet-unidentified John Doe Defendants, are continuing their blatant and widespread infringement of the Delta Marks in furtherance of their vacation package sales scheme. Each and every named Defendant is, among other causes and theories, directly and vicariously liable for the acts of its as-yet-unidentified advertisers (if any) and has <u>actual</u> knowledge of the infringement of the Delta Marks. The

4

Defendants are also liable under a theory of contributory infringement on the basis of their knowledge of and participation in the infringing advertising scheme. Finally, the Defendants have constructive knowledge of the infringement and other fraudulent conduct of those acting on their behalves and, without regard to their scienter, are being unjustly enriched, to the substantial detriment of Delta.

The Defendants comprise an extended network of individuals as well as business entities and unregistered trade names which the individual defendants use, change, and abandon in their attempt to avoid being identified as the persons responsible for the trademark piracy at issue in this matter.

At the center of the scheme is Full Moon Travel, Inc. ("FMC") and its principals Douglas Fletcher ("Fletcher") and Gonzolina Sotolongo ("Sotolongo"). *See Wallace Dec. at ¶ 7 and Exhibit C-6 thereto.* FMC was formed in August 2013 by Fletcher and Sotolongo, and they were remained the only members and managers of FMC at the time that the first of the infringing facsimiles were sent (November 2014). *Id.* Fletcher owns and uses a number of other travel-related entities in Florida including Twilight Travel, Inc. ("Twilight") (*see id. at ¶¶ 14-15 and exhibits C-12 and C-13 thereto*).

On August 12, 2015, FMC filed an amendment to its corporate records with the Florida Secretary of State, indicating that it was now owned and managed by Gerald Decker ("Decker") and Joseph Chimenti ("Chimenti") and that it shared its principal place of business with Decker and Chimenti's other entity, Destiney Marketing Services, Inc. ("Destiney"). *Id.* at ¶ 9-10. Plaintiff has confirmed that the principal place of business for FMC is now the offices of Destiney in Orlando, Florida. *See Exhibit D, Declaration of Eric J. Kolbinski ("Kolbinski Dec."), generally.*

Three times during 2015, Destiney has amended its corporate information with the Florida Secretary of State to add, remove, and change its listed officers and principle place of business. In May 2015, it identified its address as the same as FMC, with Douglas Fletcher as an officer. *Exhibit C, Wallace Dec. at ¶ 12 and Exhibit C-10 thereto.* In July 2015, it identified its address as a UPS Store mailbox in the name of Chimenti and Twlight. *Id. at ¶ 13 and Exhibit C-11.* In August 2015 – at the same time that FMC declared that ownership was transferring to Chimenti and Decker – Destiney changed addresses <u>back</u> to FMC's address, but in the name of "Twilight Travel." *Id. at ¶ 14 and Exhibit C-12 thereto.*

Both FMC and Destiney have made use of Fletcher's Docusign account under the (unregistered) trade names, "First Travel Services" and "Tours R Us." *Huhn Decl. at ¶¶ 12, 17-22, 26; Wallace Dec. at ¶¶ 2, 5-6.* The Defendants have also operated a number of Internet web sites under these fictitious names, using the same telephone numbers and call-center staff that they use for the fraudulent infringing facsimiles. *Id.*

## ARGUMENT

I. **DELTA IS ENTITLED TO A TEMPORARY RESTRAINING ORDER PROHIBITING DEFENDANTS FROM CONTINUING TO INFRINGE UPON THE DELTA MARKS VIA THEIR H.R. FAX SCHEME.**

Rule 65 of the Federal Rules of Civil Procedure authorizes the Court to enter a temporary restraining order ("TRO") when it appears that the plaintiff is entitled to the relief demanded, and such relief consists of restraining an act the continuance of which would produce injury to the plaintiff during the pendency of the litigation. See Fed R. Civ. P. 65(b). To satisfy the requirements for a TRO, the movant must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if relief is denied; (3) an injury that outweighs the nonmovant's potential injury if relief is granted; and (4) the requested injunction would not harm the public interest. *See, e.g., Statewide Detective Agency v. Miller,* 115 F.3d 904 (11th Cir.

6

1997); *Nnandi v. Richter*, 976 F.2d 682 (11th Cir. 1992); *Frio Ice, S.A. v. Sunfruit, Inc.*, 918 F.2d 154 (11th Cir. 1990); *Computer Currents Publ'g. Corp. v. Jaye Comms., Inc.*, 968 F. Supp. 684 (N.D. Ga. 1997). These are also the same four factors used in determining the propriety of a preliminary injunction that remains in place throughout the pendency of the litigation. *Gold Coast Publications, Inc. v. Corrigan*, 42 F.3d 1336, 1343 (11th Cir. 1994). In the present case, each of these factors demands the grant of the requested TRO.

A. **Delta is likely to succeed on the merits of its case.**

Delta's likelihood of success on the merits of its claims, including trademark infringement, is a virtual certainty. *See* 15 U.S.C. § 1125(a) (The Lanham Act) and 15 U.S.C. § 1125(c) (the Federal Trademark Dilution Act of 1995). Defendants' intentional piracy of the Delta Marks is legally and factually indefensible.

1. **Defendants have committed trademark infringement.**

Trademarks are protected by federal law against infringement by use of identical (i.e., counterfeit) or colorable imitations of the mark which are "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The central inquiry is whether there is a "likelihood of confusion ... [i.e.] a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2nd Cir. 1978), *cert denied* 439 U.S. 1116 (1979). The Eleventh Circuit has developed a seven-factor test for determining whether there is a likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the infringing mark; (3) the similarity between the products or services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of the advertising methods; (6) the defendant's intent; and (7) whether actual confusion has occurred. *Alliance Metals, Inc. of Atlanta v. Hinely Industries, Inc.*, 222

7

F.3d 895 (11th Cir. 2000). In the present matter, these factors show that a likelihood of confusion is a virtual certainty.

### a. The Delta Marks are strong.

The degree of protection extended to a given mark depends upon the Court's determination of the mark's strength. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir. 1983). Strong marks are given more extensive protection. *Id.* Courts reason that the more well-known the mark, the deeper the impression it creates upon the public. *Freedom Savings & Loan Assn. v. Way*, 757 F.2d 1176, 1182 (11th Cir. 1985). The factors to consider in assessing the strength of a mark include its fame and the length, exclusivity, continuity, and geographic scope of the plaintiff's use of the mark. *See generally, Turner Greenberg Assocs., Inc. v. C&C Imports, Inc.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004).

Here, the Delta Marks are exceptionally strong and are entitled to maximum protection. Delta is one of the world's largest commercial airlines, generating over 36 billion dollars in annual revenue. *(Exhibit A, Arnold Dec. at ¶ 4).* Delta offers air travel to more destinations than any other global airline, with carrier service to 330 destinations in 65 countries on six continents. *(Id.)* Delta serves more than 160 million customers each year. *(Id.)* Delta has invested billions of dollars in advertising and marketing in order to build the fame, reputation, and goodwill of the Delta Marks, both in the United States and abroad. *(Id. at ¶ 12).* These famous and incalculably valuable Marks are instantly and uniquely recognizable worldwide as symbols of the goodwill, high reputation, and high quality inherent in Delta's air transportation and its other travel-related services. *(Id.)* Moreover, because the name "Delta" represents an "arbitrary" mark given the nature of Delta's business, the mark is considered especially strong, and entitlement to protection is presumed. Trilink Saw Chain, LLC v. Blount Inc., 583 F. Supp. 2d 1293, 1311 (N.D. Ga. 2008).

b. **Defendants are using Delta's actual name and Marks.**

As the similarity between the existing and infringing marks increases, so too does the likelihood of confusion. *Alliance Metals*, 222 F.3d at 907. Where the infringed-upon marks and the infringing marks are *identical*, no further similarity-related analysis is required. Such is the case in the present matter. Defendants are using the actual Delta name and Delta Marks to masquerade as Delta. *(Arnold Dec. at ¶¶ 21-28 and at Exhibits A-4 and A-5 thereto).*

c. **The involved services and products are identical.**

The natures of the competing services and products are likewise identical. Delta's primary business activity involves the provision of air travel to its customers (*i.e.*, the sale of tickets). *(Id. at ¶ 4).* Defendants' infringement involves their literal impersonation of Delta in relation to the sale of promotional vacations and travel. *(Id. at ¶ 23 and Exhibits A-4 and A-5 thereto).* Moreover, the ultimate purpose of the infringement directly overlaps with Delta's offer of legitimate discounted travel and vacation through the sole travel agency authorized to identify itself as a corporate affiliate of Delta: MLT, Inc., a wholly-owned subsidiary of Delta doing business as "Delta Vacations." *(Id. at ¶ 24).*

d. **The involved sales mediums are identical.**

The sales medium factor also weighs solely in Delta's favor. The infringing facsimiles direct each recipient/victim to contact the Defendants to take advantage of a special promotional vacation package. *(Id. at ¶ 26 and Exhibits A-4 and A-5 thereto).* Delta offers this same sales medium – toll-free telephone numbers – by which Delta customers can purchase tickets, receive technical assistance, and receive various other forms of customer service. *(Id. at ¶ 12).*

e. **Defendants are attempting in bad faith to capitalize on Delta's business reputation and goodwill.**

If a defendant adopts a plaintiff's mark with the intent of obtaining benefit from the plaintiff's business reputation, "this fact alone may be sufficient to justify the inference that there

9

is confusing similarity." *Carnival Corp.*, 74 F.Supp. 2d at 1268 (emphasis added). Such is undeniably the case in the present matter. Each and every infringing facsimile adopts Delta's famous Marks and/or expressly purports to have originated with (or with the permission of) Delta. *(Exhibit A, Arnold Dec. at ¶¶ 22, 26-28 and Exhibits A-4 and A-5 thereto).* Defendants' facsimiles purport to advertise promotions and travel packages which are falsely affiliated with Delta. *(Id.)* Defendants' facsimiles claim that they can provide air travel at a significant discount over published fares. *(Id.)* In short, in *every* infringing facsimile, Defendants pretend to be authorized by Delta to trade upon the enormous credibility and goodwill inherent in the Delta name and Marks. This flagrant trademark piracy, coupled with the unseemly reputation of these "fax-spamming" travel offers, yields but one valid and inescapable conclusion – that each and every Defendant has acted knowingly and in bad faith.

### 2. Defendants have tarnished Delta's famous Marks.

Tarnishment is a special form of trademark infringement resulting from the unauthorized and improper association of a famous mark with an inferior or offensive product or service. Tarnishment is a recognized form of dilution and is actionable under Section 43(c)(1) of the Lanham Act. To prevail on a tarnishment claim, the trademark owner must show that: (1) its mark is famous; (2) the defendant is making a commercial use of the mark; (3) the defendant's use began after the mark became famous; and (4) the trademark owner will suffer negative associations through defendant's use of the mark. *Sony Computer Entertainment, Inc. v. Connectix Corp*, 203 F.3d 596 (9th Cir. 2000). Under the Lanham Act, the requirements to prove dilution under Section 43(c) are less stringent than the requirements to prove infringement under Section 43(a). *Clinique Labs, Inc. v. Dep Corp.*, 945 F. Supp. 547, 561 (S.D. N.Y. 1996). As is the case with Delta's infringement claim, each of the determinative factors demand a finding that Delta is likely to prevail on the merits of its tarnishment claim.

10

### a. The Delta Marks are famous.

To determine whether a mark is distinctive and famous, a court considers the following non-exclusive factors:

> (A) the distinctiveness of the mark; (B) the duration and extent of the use of the mark; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third-parties; and (H) whether the mark was registered under the act of March 3, 1881 or the Act of February 20, 1905 on the principal register.

15 U.S.C. § 11259(c)(1). Here, for all of the reasons set forth *supra* at Argument, Sec. I.A.1 in relation to the strength of the Delta Marks, those Marks – which have been used for decades in connection with Delta's nationwide and worldwide advertising of its air transportation and other related travel services – are also "famous" under the dilution prong of the Lanham Act.

### b. Defendants are making commercial use of the Delta Marks.

The voluminous examples of Defendants' infringing facsimiles attached to *Exhibit A, Arnold Dec. at Exhibits A4-A5* thereto are proof positive of Defendants' wrongful use of counterfeit Delta Marks in conjunction with their travel package scheme.

### c. The infringing use occurred after the Marks became famous.

The marks, "DELTA" and "DELTA AIR LINES" and Delta's WIDGET LOGO, were registered more than 50 years ago and have been in widespread and continuous use by Delta at all times thereafter. *(Exhibit A, Arnold Dec. at ¶¶ 13-16 and Exhibits A-1 and A-2 thereto).* These Marks accordingly were famous long before Defendants pirated them in 2014 in support of Defendants' travel package scheme. Indeed, Defendants clearly chose to infringe upon the Delta Marks <u>because</u> they are famous.

11

### d. Delta will suffer serious negative associations from the Defendants' use of the Delta Marks.

The harm resulting from tarnishment of a famous mark relates primarily to damage to the mark's positive associational value. *Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 507 (2nd Cir. 1996); *Deere & Co. v. MTD Prods, Inc.*, 41 F.3d 39, 43 (2nd Cir. 1994). This damage is especially severe when the mark is used in an "unwholesome" or "unsavory" context. *Hormel*, 73 F.3d at 507. It is difficult to image a more harmful infringing use in the context of Delta's business than Defendants' piracy of the Delta Marks to promote their disreputable "boiler room" travel package scheme described herein.

### B. Defendants' continuing infringement will result in irreparable injury to Delta.

"[A] sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may <u>by itself</u> constitute a showing of ... [a] substantial threat of irreparable harm." *McDonald's Corp v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) (emphasis added). The injury resulting from infringement or tarnishment causes the plaintiff to lose the benefit of the marks' function as a distinctive and positive identifier of the plaintiff and its services. *Id.* As a result, the value of the mark is greatly impaired, and re-establishment of the lost value is difficult if not impossible. *Id.* It is generally recognized in trademark infringement cases that: (1) there is no fully adequate remedy at law to redress infringement; and (2) infringement by its nature causes irreparable harm. *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir. 1989).

### C. Delta's continuing injuries in the absence of a TRO outweigh any "injuries" the Defendants might claim to suffer if the TRO is granted.

Contrary to the permanent and irreparable injury to Delta and the Delta Marks caused by Defendants' ongoing trademark piracy, the possibility of injury to any legitimate interest of Defendants by this Court's issuance of the requested TRO is nonexistent. Without regard to the

12

nature and extent of their respective roles in the travel package scheme giving rise to Delta's lawsuit or their related scienter in relation to those violations, **no Defendant** is authorized to use the Delta Marks. *(Exhibit A, Arnold Dec. at ¶ 22)*. Any claim by a Defendant that he/it will somehow be damaged by being enjoined from using the Delta Marks is frivolous.

### D. The requested TRO serves the public interest.

In cases involving trademark infringement, courts have a duty to protect both the rights of the trademark owner <u>and</u> the right of the public to be free from confusion, deception, and mistake resulting from the infringement. *Kason Industries, Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1207 (11th Cir. 1997). The blatantly fraudulent nature of the Defendants' use of the Delta Marks in connection with their travel package scheme underscores the necessity of the injunctive relief requested by Delta. Each infringing use of the Delta Marks by Defendants represents yet another attempt by Defendants to confuse and mislead a responding recipient/victim. The actual confusion that has already occurred emphasizes even more the necessity of quick and decisive action to halt Defendants' ongoing fraud and infringement.

## II. DELTA IS ENTITLED TO AN *EX PARTE* SEIZURE ORDER.

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* seizure order is appropriate upon a showing that: (i) the person obtaining the order will provide adequate security; (ii) an order other than an *ex parte* seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant is likely to succeed in showing the defendant used a counterfeit mark; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendant, the

13

defendant or persons acting in concert with defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court. 15 U.S.C. § 1116(d)(4)(B).

Where, as here, each of the statutory elements is satisfied, it is an abuse of discretion to deny an *ex parte* seizure order. *Vuitton v. White*, 945 F.2d 569, 575-76 (3rd Cir. 1991) (discussing the legislative history of § 1116(d) that "*ex parte* seizures ... [are] a necessary tool to thwart the bad faith efforts of fly by night defendants to evade the jurisdiction of the court"); *Lorillard Tobacco Co. v. Bisan Food Corp.*, 2004 WL 1682766 (3rd Cir. 2004) (to same effect).

In granting plaintiff an *ex parte* seizure order, one district court stated that notice of the restraining order without seizure:

> would be likely to result in the disappearance of the counterfeit FILA goods and related records, or the "dumping" or transfer of the counterfeit goods to unknown third parties jeopardizing plaintiff's ability to prevent irreparable injury, to stop distribution of the counterfeit FILA products, and to determine the source and extent of the defendants' dealings.

*Fimab-Finanziaria Maglificio v. Kitchen*, 548 F. Supp. 248, 250 (S.D. Fla. 1982). Perceiving the unfortunate reality of this situation, the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, district courts throughout the United States now regularly issue *ex parte* seizure orders. A sample seizure order, which was issued by another court in the 11th Circuit in a very similar trademark infringement/counterfeiting case, is attached hereto at Exhibit E.

Delta meets each criteria for issuance of a seizure order. Delta has indicated the willingness and ability to provide a bond. *(See Delta's Proposed Order at Exhibit F)*. Delta has not publicized the requested seizure and, in relation to its pending motion, has already shown Defendants' public and commercial use of the Delta Marks and the irreparable harm flowing therefrom. Through its investigation and research, Delta has gathered evidence tending to show

the likely location of any infringing faxes or other infringing marketing materials not yet sent and the likely location of business records showing the extent of each wrongdoer's involvement in the infringement scheme. *(See discussion of various Defendants, above).* Finally, given the blatantly fraudulent nature of Defendants' trademark piracy, an order other than an *ex parte* seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114. Defendants have <u>no legally-cognizable interest whatsoever</u> in continuing to possess or use any form of the infringing faxes or other infringing marketing materials. Were Delta to provide advance notice of its demand for the infringing facsimiles, other infringing materials, and all underlying documents/information, Defendants would likely destroy, move, hide, or otherwise make such matter inaccessible to the Court.

## III. DELTA IS ENTITLED TO EXPEDITED DISCOVERY.

District courts have broad power to permit expedited discovery allowing a plaintiff to take early depositions and to require early document production in appropriate cases. *See,* Fed. R. Civ. P. 30(b) and 34(b). Expedited discovery may be granted upon a showing of "good cause" by the moving party. *Arista Records, LLC v. Does 1-7,* Civ. Act. No. 3:08-cv-18 (CDL), 2008 WL 542709 at *1 (M.D. Ga. Feb 25, 2008). "Good cause" in this context includes the need by a plaintiff claiming infringement, in absence of other reasonable sources or means, to identify and obtain other "basic information" about the infringers. *Id.* Such information includes – as Delta now seeks – defendants' locations and legal status, especially when – as is the case herein – there is a concern over the possibility of spoliation of evidence. *United Parcel Service of America, Inc. v. John Does 1-10,* Civ. Act. No. 1-03-cv-1639, 2003 WL 21715365 at *1 (N.D. Ga., June 13, 2003).

Delta is being irreparably and inarguably harmed by Defendants' illegal use of the Delta Marks in their travel package sales scheme. To contain the ongoing infringement, Delta must

15

therefore, without delay, identify and find those wrongdoers who have not yet been named and/or located. The requested discovery is the only means by which Delta can accomplish this. Delta's need for expedited discovery is especially vital given the measures that Defendants have taken to conceal their identities and the other deceptive tactics which they have employed. *(Exhibit C, Wallace Dec., generally; Exhibit D, Declaration of Eric J. Kolbinski ("Kolbinski Dec." generally).* The discovery requested in Delta's Proposed Order has been carefully limited to include only what is essential for Delta to identify and locate any remaining wrongdoers and to prove its entitlement to immediate injunctive relief against them.

## CONCLUSION

For the foregoing reasons, Delta respectfully requests that its Motion for Temporary Restraining Order, Preliminary Injunction, Ex Parte Seizure Order, and Expedited Discovery be GRANTED on the terms set forth in the Proposed Order attached hereto at Exhibit F, with such relief to include:

(a) The prohibition via a temporary restraining order of Defendants' further use of infringement upon the Delta name and Marks;

(b) The seizure of all infringing materials, including any original, unsent, or master facsimiles in the possession, custody, or control of Defendants, along with any documents showing or tending to show the identities of other infringers and the nature and extent of the infringement by any Defendant;

(c) An order to show cause why a preliminary injunction should not issue;

(d) Expedited discovery;

(e) The award to Delta of its attorneys' fees and costs incurred in bringing this Motion; and

(f) Such other and further relief as this Court deems just and proper.

16

Respectfully submitted this ___10th___ day of December, 2015.

JOHN H. RAINS III, P.A.

_____
John H. Rains, III (FL Bar No. 280283)
501 East Kennedy Boulevard, Suite 750
Tampa, FL 33602

Phone: (813) 221-2777
Fax:    (813) 221-3737
Email: jrains@johnrains.com
Email2: ehill@johnrains.com
Attorneys for Plaintiff Delta Air Lines, Inc.


*Of counsel to Plaintiff Delta Air Lines, Inc.*
*(pro hac vice applications submitted)*

Kelly O. Wallace
Georgia Bar No. 734166
Jamie Woodard
Georgia Bar No. 77592
Paul F. Wellborn, III
Georgia Bar No. 746720

WELLBORN, WALLACE & WOODARD, LLC
1175 Peachtree St., NE
100 Colony Square, Suite 300
Atlanta, Georgia 30361

| | |
|---|---|
| Phone: | (404) 815-9595 |
| Fax: | (404) 815-9957 |
| E-mail: | kelly@wellbornlaw.com |
| | jamie@wellbornlaw.com |
| | pete@wellbornlaw.com |